UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| JOE HAND PROMOTIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> AFRIM HETEMI, et. al., <br><br> Defendants. | Case No. 1:16-cv-00473-CWD <br><br> **MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court in the above-entitled matter is the Plaintiff's Motion for Default Judgment as to the Defendants Afrim Hetemi and Burhan Hetemi, individually, and as officers, directors, shareholders or principals of Bumpin' Bernies a/k/a 3D Nightclub ("Defendants"). (Dkt. 15.) Having fully reviewed the record, the Court finds the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, the motion will be decided on the record without oral argument.

**MEMORANDUM DECISION AND ORDER - 1**

## BACKGROUND

On October 24, 2016, Plaintiff filed its complaint in this matter against Defendants. Plaintiff is a Pennsylvania corporation that specializes in distributing and licensing premier sporting events to commercial locations such as bars, restaurants, lounges, clubhouses and similar establishments. Defendants Afrim and Burhan Hetemi operate Bumpin' Bernies, also known as the 3D Nightclub, in Twin Falls, Idaho. Since 2001, Plaintiff has been the exclusive domestic distributor for the world's premier mixed martial arts promotion company, the Ultimate Fighting Championship®. By contract, Plaintiff held the exclusive commercial exhibition rights to the broadcasts of *UFC® 183: Silva v. Diaz,* telecast nationwide on January 31, 2015 ("UFC 183 Program"), and *UFC® 199: Rockhold v. Bisping 2,* telecast nationwide on June 4, 2016 ("UFC 199 Program") (collectively "Programs").

The Programs' broadcast originated via satellite uplink, and was later re-transmitted interstate to cable systems and satellite television companies via satellite signal. Plaintiff entered into agreements with various commercial establishments in the State of Idaho that, in exchange for a fee, allowed them to broadcast the Programs to their patrons. The fee is calculated based on the maximum occupancy of the commercial establishment. (Dkt. 15-2 at 2 and 4.) In return, Plaintiff expended funds to market, advertise, promote, administer and transmit the Programs broadcast to those establishments in the State of Idaho.

Once an establishment paid the sublicense fee and was authorized to broadcast the events, it was provided with electronic decoding equipment and the satellite coordinates

necessary to receive the signal. Joe Hand, Jr., explained that, to intercept the broadcasts without obtaining the decoding equipment from Plaintiff, signal pirates must use black boxes, smartcards, or other means of interception. (Dkt. 15-1 at 5.)

To ensure no commercial establishment obtained the programming without paying Plaintiff, Plaintiff engages outside independent auditors to identify and visit establishments that it finds are broadcasting the programming without authorization. Plaintiff's outside auditor visited Bumpin' Bernies on January 31, 2015, and noted that it had an approximate capacity of one hundred people, with fifteen patrons present watching the broadcast of the UFC 183 Program on four televisions. Another auditor visited Bumpin' Bernies on June 4, 2016, and estimated an approximate capacity of at least seventy-five patrons, with seventeen patrons present watching the broadcast of the UFC 199 Program on three televisions.

Defendants did not contract with Plaintiff or pay a fee to Plaintiff to obtain the proper license or authorization to broadcast the Programs at either establishment. At no time did Plaintiff give Defendants license, permission or authority to broadcast the Programs in Bumpin' Bernies. According to the rate sheets for the respective programs, the fee for a commercial establishment for the UFC 183 Program if the establishment had a capacity of 51-100 persons was $1,100.00. The fee for the UFC 199 Program was $998.00 for a similar occupancy rate.

Instead of paying the sublicense fee, Plaintiff alleges that Defendants, by unauthorized satellite transmission or, alternatively, by unauthorized receipt over a cable system, willfully intercepted or received the interstate communication of the Programs or

**MEMORANDUM DECISION AND ORDER - 3**

assisted in such actions. Defendants then transmitted, divulged and published the communication, or assisted in transmitting, divulging and publishing the communication to patrons in Bumpin' Bernies, without authorization, license, or permission to do so from Plaintiff.  Plaintiff contends Defendants pirated Plaintiff's licensed exhibition of the Programs and infringed upon Plaintiff's exclusive rights, while avoiding proper authorization and payment to Plaintiff.

Plaintiff alleges Defendants' acts constitute violations of the Communications Act of 1934, specifically sections 47 U.S.C. § 605 (prohibiting cable piracy), or alternatively 47 U.S.C. § 553 (prohibiting satellite piracy). The Complaint contends Bumpin' Bernies broadcast the UFC 183 Program on January 31, 2015, and the UFC 199 Program on June 4, 2016. Defendants were served with the Summons and Complaint on November 7, 2016. (Dkt. 7, 8.) On April 21, 2017, Plaintiff sought entry of default, which the Clerk granted on April 24, 2017. This motion followed on May 8, 2017.

Plaintiff argues it is entitled to damages under 47 U.S.C. § 605, which allows a plaintiff to recover statutory damages of up to $10,000.00 for each violation. 47 U.S.C. § 605(e)(3)(C)(i)(II). Additionally, Plaintiff seeks additional damages of up to $100,000.00 per violation, on the grounds that the violations were committed "willfully and for purposes of direct or indirect commercial advantage or private financial gain…." 47 U.S.C. § 605(e)(3)(C)(ii). Plaintiff contends that $5,000 for each violation of Section 605(e)(3)(c)(i)(II), and $20,000 for each violation of Section 605(e)(3)(C)(ii), plus costs of $545.42, would compensate it for its losses and adequately deter future conduct. Plaintiff seeks also to collect attorney fees, in an amount to be determined at a later time.

**MEMORANDUM DECISION AND ORDER  - 4**

Defendants have not appeared in this action. Plaintiff, the only party who has appeared, has consented in writing to the jurisdiction of a magistrate judge to enter final orders in this case.[1]

## DISCUSSION

1. **Default Judgment**

Pursuant to Federal Rule of Civil Procedure 55(b)(2), the Court may enter a default judgment where default under Rule 55(a) has been previously entered based upon failure to plead or otherwise defend the action. Fed. R. Civ. P. 55(b). Once a party's default has been entered, the factual allegations of the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party. Fed. R. Civ. Proc. 8(b)(6); *see also Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); *Garamendi v. Henin*, 683 F.3d 1069, 1080 (9th Cir. 2012). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

A defendant's default does not, however, automatically entitle the plaintiff to a court-ordered default judgment. *Draper v. Coombs*, 792 F.2d 915, 924–25 (9th Cir. 1986). The court "must still consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Landstar Ranger, Inc. v. Parth Enterprises, Inc.*, 725 F.Supp.2d 916, 920 (C.D.

---

[1] *See United States v. Real Property*, 135 F.3d 1312, 1316 (9th Cir. 1998) (holding a magistrate judge had jurisdiction to enter final judgment over defaulted person who was technically not a "party" to the litigation); *see also, Walters v. Astrue*, 2008 WL 618933 (N.D. Cal. 2008) (dismissing complaint pursuant to 28 U.S.C. § 1915(e)(2) where only plaintiff consented to magistrate judge, and defendants, who had not been served, were not considered parties to the action).

Cal. 2010) (citation omitted). "[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992); *see also Doe v. Qi*, 349 F.Supp.2d 1258, 1272 (N.D. Cal. 2004) ("[Although] the factual allegations of [the] complaint together with other competent evidence submitted by the moving party are normally taken as true ... this Court must still review the facts to insure that the Plaintiffs have properly stated claims for relief.")). Where the pleadings are insufficient, the Court may require the moving party to produce evidence in support of the motion for default judgment. *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987).

Whether default judgment should be entered is within the discretion of the Court. *Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 999 (N.D. Cal. 2001); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) ("The district court's decision whether to enter a default judgment is a discretionary one."). In deciding whether to exercise its discretion to impose judgment by default, the Court is directed to consider the following: (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471B72 (9th Cir. 1986) (citation omitted); *see also Landstar*, 725 F.Supp.2d at 920.

## A. *Possible Prejudice to Plaintiff*

As to the first factor, the possibility of prejudice to the Plaintiff, the Court finds this factor supports the issuance of a default judgment. Without a judgment, Plaintiff will be unable to collect amounts they contend are statutorily owed, which would compensate them for the unlawful broadcast of the programs that Plaintiff otherwise would have been paid a fee for under the terms of a sublicense agreement. *See PepsiCo, Inc. v. Cal. Sec. Cans.*, 238 F.Supp.2d 1172, 1176 (C.D. Cal. 2002). Additionally, Plaintiff argues that, without adequate consequences, signal pirates will continue to harm its lawful business interests.

## B. *Sufficiency of the Complaint / Merits of Plaintiff's Substantive Claims*

The second and third factors concerning the merits of Plaintiff's case and the sufficiency of Plaintiff's Complaint are commonly analyzed together. *PepsiCo,* 238 F.Supp.2d at 1175B76. These two factors "require that a plaintiff state a claim on which [it] may recover." *Id.* Again, the Court takes the factual allegations in the Complaint as true. *Geddes*, 559 F.2d at 560.

The Complaint in this case raises two claims for relief, both under 47 U.S.C. § 605(a). Section 605 provides, in relevant part:

> No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or

>any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). Although § 605(a) refers to radio communication, Congress brought satellite communications and cable television services within the purview of the section when it added subsections (b)-(e). *See* 47 U.S.C. § 605(b)-(e); *see also Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 911–912 (6th Cir.2001) (discussing legislative history of § 605).

Based on the factual allegations in the complaint, Plaintiff satisfies the elements for stating a violation under Section 605(a). Plaintiff alleges the Defendant restaurant and its owners broadcast the Programs to its patrons on multiple televisions and did so without a proper license. To obtain the broadcast signal for the Programs, Defendants had to intercept a cable or satellite communication, or both. The act of intercepting cable or satellite communications and broadcasting that signal to its patrons without a license is a violation of § 605.

### C. *The Sum of Money at Stake in the Action*

The third default judgment factor balances "the amount of money at stake in relation to the seriousness of the [d]efendant's conduct." *PepsiCo*, 238 F.Supp.2d at 1176; *see also Eitel*, 782 F.2d at 1471-72. "This requires that the court assess whether the recovery sought is proportional to the harm caused by defendant's conduct." *Landstar*, 725 F.Supp.2d at 921 (citation omitted).

The amount of damages sought by Plaintiff here is based upon a statutory provision of damages, which are difficult to quantify. In addition, Plaintiff seeks an enhanced damage award, which is left to the Court's discretion, for the willful acts of piracy. The Court finds that the statutory provisions providing for damages within the Court's discretion are proportional to the harm and wrongdoing claimed.

### D.     *The Possibility of a Dispute Concerning Material Facts*

Plaintiff has alleged facts and pointed to evidence supporting its claims. Defendants have not filed any materials challenging the accuracy of the allegations in the complaint or the affidavits supporting Plaintiff's motion. As determined above, the Court finds the uncontested facts, when taken as true, establish the merits of the claims for violations of 47 U.S.C. § 605(a). Therefore, the Court finds there are no factual disputes precluding entry of default judgment on Plaintiff's claims.

### E.     *Whether the Default was Due to Excusable Neglect*

The entry of default here is not attributable to excusable neglect. Plaintiff served Defendants, who have failed to appear.

### F.     *The Strong Policy Favoring Decisions on the Merits*

The general rule or preference is that cases "be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, "this preference, standing alone, is not dispositive." *PepsiCo*, 238 F.Supp.2d at 1177 (citation omitted). "Defendant's failure to answer plaintiffs' complaint makes a decision on the merits impractical, if not impossible." *Id.* Thus, Rule 55(a) allows the Court to "decide a case before the merits are heard if defendant fails to appear and defend." *Landstar*, 725

**MEMORANDUM DECISION AND ORDER - 9**

F.Supp.2d at 922. Because the Defendants have failed to properly appear or respond to Plaintiff's claims in this case, the general policy does not preclude the entry of default judgment against the Defendants.

Based on the record and the Court's analysis, the Court finds the *Eitel* factors weigh in favor of entering default judgment in this matter on the two claimed violations of 47 U.S.C. § 605(a).

**2. Damages**

"If the court determines that the allegations in the complaint are sufficient to establish liability, it must then determine the amount and character of the relief that should be awarded." *Landstar*, 725 F.Supp.2d at 920 (citations omitted). The complaint's factual allegations relating to the amount of damages are not taken as true. *Geddes*, 559 F.2d at 560. Upon entering default judgment under Rule 55(b)(2), the Court "may conduct hearings or make referrals...when, to enter or effectuate judgment, it needs to...determine the amount of damages." Fed. R. Civ. P. 55(b)(2). Accordingly, the amount of damages must be proven at an evidentiary hearing or through other means. *Microsoft Corp. v. Nop*, 549 F.Supp.2d 1233, 1236 (E.D. Cal. 2008).

**A.** *Statutory Damages*

In this case, Plaintiff seeks an award of statutory damages. Section 605 allows Plaintiff to recover either actual damages suffered or statutory damages for each violation "in a sum not less than $1,000 or more than $10,000, as the court considers just." 47 U.S.C. 605(e)(3)(C)(i)(I)-(II). Plaintiff seeks an award of $10,000 in statutory damages ($5,000.00 per broadcast), rather than an award based on actual damages.

**MEMORANDUM DECISION AND ORDER - 10**

Plaintiff argues it would be impossible to determine the full extent of profits lost by Plaintiff, which includes the loss of goodwill and the additional damages sustained by Defendants' actions. (Dkt. 15 at 8.) Plaintiff relies on the difficulty to fully assess damages from the unauthorized broadcast of the Programs for why the Court should, in its discretion, award statutory damages.

The Court agrees with Plaintiff that it would be difficult to completely assess the damages suffered as the result of Defendants' unlawful broadcast of the Programs. The only concrete damages known in this case are the sublicense fee, which Defendants failed to pay to Plaintiff for the right to broadcast the Programs. Based upon its approximate capacity of 100 patrons, Bumpin' Bernies would have had to pay $1,100 for the sublicense fee to broadcast the UFC 183 Program, and $998.00 for the UFC 199 Program.

These amounts, however, do not take into account the difficulty of detecting these types of violations. In this case, Plaintiff had to expend resources to send an auditor to Bumpin' Bernies to see if the restaurant had unlawfully broadcasted the Programs on two separate dates. This type of piracy is no doubt widespread and costly to enforce.

Further, Bumpin' Bernies presumably received some profit from showing the Programs to its patrons. On the night of the UFC 183 Program, Bumpin' Bernies showed the Program on four large screen televisions. *See* Aff. of Justin Boggs (Dkt. 15-4.) Plaintiff's auditor counted approximately 8 to 15 patrons in Bumpin' Bernies at various times during the broadcast. *Id*. On the night of the UFC 199 Program, Bumpin' Bernies showed the Program on three large screen televisions. *See* Aff. of Jennifer Acheson (Dkt.

**MEMORANDUM DECISION AND ORDER - 11**

15-5.) Plaintiff's auditor counted approximately 15 – 17 patrons in the establishment at various times during the broadcast. *Id.* It is reasonable to believe that one reason Bumpin' Bernies broadcast the Programs was to increase sales and profits.

Most importantly, awarding actual damages does not take into account the deterrence needed in cases like this one. Plaintiff in this case has had to "at considerable expense" retain "auditors and law enforcement personnel to detect and identify signal pirates." Aff. of Joe Hand ¶ 6 (Dkt. 15-1 at 3.) A commercial establishment will be less likely to pay the sublicense fee, and instead illegally intercept the signal, if the penalty for intercepting the signal is not substantial.

Courts have generally employed two methods to determine damages under this section. One option is to use a flat amount, determined by the Court based on the sublicense fee that was not paid, and another is to use a per patron rate. *Joe Hand Promotions, Inc. v. Wing Spot Chicken & Waffles, Inc.*, 920 F.Supp.2d 659, 667 (E.D. Va. Jan. 30, 2013). In *Wing Spot*, the court commented that other courts employing the per patron method utilize a rate of one hundred dollars per patron as an appropriate penalty when an award of what the plaintiff would have received for its sublicense fee is insufficient to deter future conduct, fully compensate the plaintiff for its losses, and disgorge the defendant of its unlawful gain. *Id.*

Utilizing the per patron method, the Court finds Plaintiff should be awarded $1,500.00 for the night of the UFC 183 Program based upon the 15 patrons seen in the establishment during that broadcast, and $1,700.00 for the night of the UFC 199

Program, based upon an approximate count of 17 patrons in the establishment that evening.

B. *Willful Damages*

Section 605 allows the Court to award up to $100,000 in additional damages when a defendant violates the section "willfully and for purposes of direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). Plaintiff seeks additional damages in the sum of $40,000 ($20,000 per violation) against Defendant in this case. *See* Pl.'s Mem at 13 (Dkt. 15 at 13.) Plaintiff argues this amount "will fairly achieve the statutory goals of restitution and deterrence." *Id*. at 12.

The Court finds this case presents an example for when an award of additional damages based upon Defendants' willful acts to intercept the Programs is appropriate. Plaintiff asserts the transmission signal "cannot be mistakenly, innocently, or accidentally intercepted." Aff. of Joe Hand ¶ 9 (Dkt. 15-1 at 5.) As one court opined, "signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems." *Time Warner Cable v. Googies Luncheonette*, 77 F.Supp.2d 485, 490 (S.D.N.Y 1999). The act of intercepting an encrypted broadcast is not done by accident, but requires an affirmative action by the defendant. *Wing Spot*, 920 F.Supp. at 668. Stated bluntly, the Court finds Defendants took willful action to unlawfully intercept and broadcast the Programs.

Next, the Court finds that the willful acts were done for either "direct or indirect commercial advantage or private financial gain." 47 U.S.C. § 605(e)(3)(C)(ii). Bumpin' Bernies is a commercial establishment, and on the two occasions it broadcast the

**MEMORANDUM DECISION AND ORDER - 13**

Programs, it hosted approximately seventeen patrons who were able to enjoy the Programs at no cost to Defendants. Each of the restaurant's four televisions showed the Programs. Because Defendants showed the Programs on four of its televisions at no cost, the Court concludes Defendant acted willfully for commercial advantage and private financial gain.

Other courts when determining additional statutory damages have considered factors "such as allegations of: (1) repeated violations over an extended period of time; (2) substantial unlawful monetary gains; (3) significant actual damages to plaintiff; (4) defendant's advertising for the intended broadcast of the event; and (5) defendant's charging a cover charge or charging premiums for food and drinks." *Kingvision Pay-Per-View v. Rodriguez*, 2003 WL 548891, at *1 (S.D.N.Y. Feb. 24, 2003); *see also Joe Hand Promotions, Inc. v. Bougie, Inc.*, 2010 WL 1790973, at *6 (E.D. Va. April 12, 2010).

Based upon these factors, the Court finds that a modest fine is appropriate in this case. Here, there were two repeated violations. However, based upon the number of patrons attracted, there does not appear to have been substantial unlawful monetary gains beyond nonpayment of the sublicense fee. The establishment is not large, and is located in a small town in Idaho. Although the broadcast of the Programs likely led to some unlawful monetary gain by Defendant, it is not likely enough that the financial gain on the two occasions would be considered "substantial." Similarly, the amount of actual damages, equivalent to the two unpaid sublicense fees, would have been $1,100 for the sublicense fee to broadcast the UFC 183 Program, and $998.00 for the UFC 199 Program. Neither auditor contends Defendants charged a cover or a premium for food or

drink that evening, although Defendants did advertise the Programs on its Facebook page. (Dkt. 15-6 at 5 – 14.) The Court acknowledges, however, that additional damages to Plaintiff such as lost revenue, devaluation of its product, and loss of goodwill, are tangible losses.

The Court recognizes the need to deter signal pirates in cases like this one. The Court also agrees with other courts that, "although the amount of damages should be an adequate deterrent, the violation is not so serious as to warrant putting the restaurant out of business." *Garden City Boxing Club, Inc. v. Polanco*, No. 05 Civ. 3411, 2006 WL 305458, at *5 (S.D.N.Y. Feb. 7, 2006) (awarding an additional $10,000 for a single violation against a small business).

Here, in the exercise of its discretion, the Court finds an award of an additional $5,000 ($2,500 for each of the two broadcasts) is appropriate, in light of all the circumstances considered and as explained above.

3.   **Costs and Fees**

Plaintiff seeks also recovery of $545.42 in filing fees and service incurred in bringing this action. The Court finds this amount is properly recoverable by Plaintiff in this case and is therefore awarded. Plaintiff has reserved its right to file a motion seeking recovery of its attorney's fees in this matter pursuant to 47 U.S.C. § 605(e)(3)(B)(iii).

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:** Plaintiff's Motion for Default Judgment (Dkt. 15) is **GRANTED** as follows:

1. Default Judgment is HEREBY ENTERED against the Defendants Afrim Hetemi and Burhan Hetemi, individually, and as officers, directors, shareholders and/or principals of Bumpin' Bernies a/k/a 3D Nightclub for two violations of 47 U.S.C. § 605(a).

2. Plaintiff is awarded damages in the amount of $8,200.00 plus costs in the amount of $545.42 for a total award of $8,745.42.

3. The Court will reserve entry of final judgment until it determines the amount of reasonable attorney's fees Plaintiff may recover pursuant to 47 U.S.C. § 605(e)(3)(B)(iii).

4. The Clerk of the Court is directed to serve a copy of this Order on all parties with the Defendants being served at the address listed on the Affidavits of Service. (Dkt. 5 - 8.)

DATED: June 6, 2017

Honorable Candy W. Dale
United States Magistrate Judge